# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE THE BOEING CO. DERIVATIVE LITIGATION | ) ) | Consol. C.A. No. 2024-1210-MTZ |

## MEMORANDUM OPINION

Date Submitted: May 22, 2026
Date Decided: August 13, 2026

Derrick B. Farrell, Matthew L. Miller, Robert B. Lackey, BLEICHMAR FONTI AND AULD LLP, Wilmington, Delaware; Javier Bleichmar, Joseph A. Fonti, BLEICHMAR FONTI AND AULD LLP, New York, New York; Lesley E. Weaver, STRANCH, JENNINGS & GARVEY, PLLC, Oakland, California; Christine M. Mackintosh, Kelly L. Tucker, Vivek Upadhya, GRANT & EISENHOFER P.A, Wilmington, Delaware, *Attorneys for Plaintiffs Ohio Public Employees Retirement System and State Teachers Retirement System of Ohio.*

Justin O. Reliford, Elizabeth K. Dragovich, SCOTT+SCOTT ATTORNEYS AT LAW LLP, Wilmington, Delaware; Donald A. Broggi, Jing-Li Yu, SCOTT+SCOTT ATTORNEYS AT LAW LLP, New York, New York; Ora L. Lupear. Maxwell R. Huffman, SCOTT+SCOTT ATTORNEYS AT LAW LLP, San Diego, California, *Attorneys for Plaintiff Oklahoma Firefighters Pension and Retirement System.*

Kyle H. Lachmund, Elizabeth J. Freud, Clayton B. Faller, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Sharon L. Nelles, David M.J. Rein, Leonid Traps, SULLIVAN & CROMWELL LLP, New York, New York, *Attorneys for Defendants Robert A. Bradway, David L. Calhoun, Lynne M. Doughtie, David L. Gitlin, Lynn J. Good, Stayce D. Harris, Akhil Johri, David L. Joyce, Lawrence W. Kellner, Steven M. Mollenkopf, John M. Richardson, Sabrina Soussan, Ronald A. Williams, Douglas Ackerman, Uma M. Amuluru, Edwin J. Clark, Stanley Deal, Michael Delaney, Mark C. Fava, Thomas Galantowicz, Darrin Hostetler, Elizabeth Lund, Stephanie Pope, Scott A. Stocker, and Brian J. West, and Nominal Defendant The Boeing Company.*

**ZURN, Vice Chancellor.**[1]

---

[1] Sitting by designation under Del. Const. art. IV, § 13(2).  Docket item ("D.I.") 155.

The Boeing Company ("Boeing" or the "Company") is among "the world's largest manufacturers of commercial aircraft."[2] "More than 10,000 Boeing commercial jetliners are currently in service worldwide."[3] Those planes were built by a global workforce of over 150,000 Boeing employees.[4]

After two airplane crashes in 2018 and 2019, Boeing's safety standards and board oversight of safety were questioned. Boeing came to agreements with aggrieved regulators and stockholders by which Boeing made hefty payments and improvements in manufacturing, safety, and board oversight.

But Boeing would suffer another spectacular mechanical failure. In January 2024, a Boeing jet's door plug blew off at 15,000 feet. It appears undisputed the incident was caused by poor manufacturing. Regulators demanded fines, and stockholders came back to this Court to hold Boeing's board accountable, complaining of more oversight failures.

The plaintiffs have failed to plead any source of oversight liability that would compromise Boeing's directors' ability to impartially consider a demand for derivative litigation. The stockholders themselves tell a story of a board that was

---

[2] D.I. 87 [hereinafter "Am. Compl."] ¶ 74.

[3] *Id.* ¶ 18.

[4] The Boeing Co., Annual Report (Form 10-K) at 2 (Jan. 27, 2023); *see* Am. Compl. ¶ 1 (defining the relevant time period as "the period from at least 2021 through February 5, 2025").

attentive to safety, including the risks inherent in running a large manufacturing company making complicated machines with a post-COVID workforce. The board received copious reporting on numerous manufacturing and compliance risks, as well as management's ongoing efforts to reduce those risks. None of that reporting put the board on notice of ongoing violations of law or a risk of serious corporate trauma that triggered a duty to act. Much of the reporting had nothing to do with the causes of the door plug blowout or subsequent regulatory costs.

Delaware law does not hold corporate fiduciaries liable merely because a general risk materialized. In the absence of a bad faith dereliction of duty upon seeing a red flag, the defendants' motion to dismiss is granted.

## I.     BACKGROUND[5]

---

[5] The facts are drawn from the operative amended complaint, the documents integral to it, and those incorporated by reference. Am. Compl.; *see Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004). Further, "[t]he court may take judicial notice of facts publicly available in filings with the SEC." *See Omnicare, Inc. v. NCS Healthcare, Inc.*, 809 A.2d 1163, 1168 n.3 (Del. Ch. 2002).

Citations in the form of "Defs.' Ex. —" refer to the exhibits in support of Defendants' Motion to Dismiss, available at D.I. 95 through D.I. 129 and D.I. 139. Before filing this action, Plaintiffs pursued and received books and records pursuant to 8 *Del. C.* § 220. The Amended Complaint cites many of those books and records. The parties do not contest that under the incorporation by reference doctrine, I may consider those documents and Defendants' exhibits in support of the Motion to determine whether the Amended Complaint has accurately referenced their contents in support of its claims and in pleading demand futility. *Reiter ex rel. Cap. One Fin. Corp. v. Fairbank*, 2016 WL 6081823, at *5–6 (Del. Ch. Oct. 18, 2016).

Plaintiffs Oklahoma Firefighters Pension and Retirement System, Ohio Public Employees Retirement System, and State Teachers Retirement System of Ohio ("Plaintiffs") are Boeing stockholders.[6] They seek to bring this action derivatively against twenty-five current and former Boeing directors and officers ("Defendants").[7]

## A. Boeing Recommits To Safety After The 737 MAX Crashes.

In 2018 and 2019, two separate Boeing 737 MAX crashes took 346 lives.[8] The tragedies inspired multiple investigations and proceedings in multiple arenas.[9] Regulatory authorities assessed civil and criminal penalties,[10] and stockholders turned to this Court to hold Boeing's fiduciaries accountable for the resulting corporate trauma.[11]

In January 2021, Boeing entered into a deferred prosecution agreement ("DPA") with the Department of Justice ("DOJ") to resolve a criminal charge related to the Federal Aviation Administration's ("FAA") evaluation of Boeing's 737 MAX

---

[6] Am. Compl. ¶¶ 71–73.

[7] *Id.* ¶¶ 75–109.

[8] *Id.* ¶ 155.

[9] *Id.* ¶¶ 156, 189.

[10] *See, e.g., id.* ¶¶ 174, 185.

[11] *See In re Boeing Co. Deriv. Litig.* ("*Boeing I*"), 2021 WL 4059934, at *20 (Del. Ch. Sept. 7, 2021).

3

aircraft.[12]  In exchange, Boeing agreed to pay a $243.6 million criminal monetary penalty, make over $2 billion in compensation payments, and implement a host of compliance obligations designed to prevent violations of U.S. fraud laws.[13]  Those obligations required Boeing to "foster a culture of ethics and compliance with the law in its day-to-day operations," implement controls concerning airworthiness certifications and manufacturing records, and adjust its compliance program based on periodic risk assessments.[14]

In May, Boeing entered into a settlement with the FAA to resolve three open cases involving supplier oversight problems.[15]  Boeing agreed to pay an approximately $27 million civil penalty, "which could be reduced to $17 million if Boeing completed certain corrective actions."[16]  Those corrective actions entailed "enhanced oversight of parts from suppliers 'shipped at risk'" to ensure their safety for installation and operation.[17]

---

[12] Am. Compl. ¶¶ 172–79; Am. Compl. Ex. A [hereinafter "DPA"].

[13] DPA ¶¶ 10, 12–13, 21–23.

[14] Am. Compl. Ex. B [hereinafter "Plea Agreement"] at Attachment A-1 ¶ 6; *see also* DPA at Attachment C.

[15] Am. Compl. ¶ 185.

[16] *Id.*

[17] *Id.* ¶ 186.

Boeing stockholders also sued the board for bad faith oversight failures.[18]  In November, the parties to that case executed a settlement agreement, which this Court approved in March 2022.[19]  It called for a $237.5 million payment to the Company and sweeping corporate governance reforms.[20]  Boeing created an independent board Aerospace Safety Committee to oversee the safety of Boeing's aerospace products and services; created a Product and Services Safety Organization that reports to Boeing's Chief Engineer and the Aerospace Safety Committee; imposed substantial Board and Aerospace Safety Committee reporting requirements; committed to ensuring that at least three directors have "knowledge, experience, and/or expertise with aviation/aerospace, engineering, and/or product safety oversight"; and separated the CEO and Board Chair positions.[21]

### B.    Boeing's Corporate Governance And Oversight Of Airplane Safety And Quality

As of the filing of Plaintiffs' original complaint, Boeing was managed by a twelve-member board of directors (the "Board").[22]  During the relevant time, the

---

[18] *See Boeing I*, 2021 WL 4059934, at \*1.

[19] Am. Compl. ¶¶ 199–202; Defs.' Ex. 1.

[20] Defs.' Ex. 1 ¶¶ 20–21; *see also In re The Boeing Co. Deriv. Litig.*, C.A. No. 2019-0907-MTZ, at D.I. 193 Ex. A.

[21] Defs.' Ex. 1 ¶¶ U, W, EE.

[22] Am. Compl. ¶ 75.

Board met at least bimonthly.[23] Airplane safety was discussed at every meeting.[24] At each Board meeting, management presented a Boeing Commercial Airplanes ("BCA") Update reporting on safety and quality risks related to BCA's operational performance and production targets.[25] Twice a year, the Chief Aerospace Safety Officer presented a Global Aerospace Safety Update reporting on safety initiatives.[26]

The Board had two committees that oversaw compliance risks pertinent to airplane safety and quality.[27] The Aerospace Safety Committee was responsible for oversight of "the safe design, development, manufacture, production, operation, maintenance, and delivery of the Company's aerospace products and services."[28] At all relevant times, it comprised independent directors with extensive engineering, manufacturing, aerospace, aviation, or safety expertise.[29] The Aerospace Safety Committee met at least twenty-three times between January 2022 and July 2024.[30]

---

[23] *See* Defs.' Exs. 122–135.

[24] *Id.*

[25] *See, e.g.*, Am. Compl. ¶ 465(g) ("A June 27, 2023 BCA Update . . . to the Board disclosed various Spirit rework issues."); *id.* ¶ 519(d) (referencing a June 27, 2023 BCA Update "explaining that the '[s]upply chain [was] driving traveled work' for the 787 program").

[26] *See, e.g.*, Defs.' Ex. 88 at -7313; Defs.' Ex. 89 at -6400; Defs.' Ex. 90 at -6795; Defs.' Ex. 91 at 7555; Defs.' Ex. 92 at -8305.

[27] *See, e.g.*, Am. Compl. ¶¶ 582, 597.

[28] Defs.' Ex. 1 ¶ U; *see* Am. Compl. ¶ 200.

[29] *See* The Boeing Co., Proxy Statement (Schedule DEF14A) at 13–23 (Apr. 5, 2024); The Boeing Co., Proxy Statement (Schedule DEF14A) at 8–14 (Mar. 3, 2023); The Boeing Co., Proxy Statement (Schedule DEF14A) at 10–15 (Mar. 11, 2022).

[30] *See* Defs.' Exs. 8–30.

6

During these meetings, it reviewed key risks and incidents pertaining to airplane safety through several reporting mechanisms.

1.      **Safety Management System ("SMS") Risk Register Reports** cover updates, metrics, and remediation efforts related to various airplane safety and quality risks. Those risks include recordkeeping noncompliance and foreign object debris ("FOD") levels.[31]

2.      **In-Service Safety Reports** cover recent safety incidents involving Boeing aircraft, Boeing's response to the incidents, and its assessment of root causes.[32] These reports aim to ensure the Board or the Aerospace Safety Committee learns of significant safety incidents or regulatory actions "within 24 hours or as soon as reasonably practicable after Boeing, is notified or made aware of an event."[33]

3.      **SMS Implementation Reports** cover SMS updates, including those related to the Speak Up platform to encourage employees and others to raise safety concerns.[34]

4.      **Special Attention Reports** provide updates on matters requiring the Aerospace Safety Committee's attention. Those matters include metrics on

---

[31] *See, e.g.*, Am. Compl. ¶ 480(e) (quoting June 27, 2022 SMS Risk Register Report referencing "[s]tamping allegations"); *id.* ¶ 581(a) (quoting February 10, 2022 SMS Risk Register Report referencing the potential need for "[l]ate stage rework" due to FOD).

[32] *See, e.g.*, *id.* ¶ 465(a) (referencing "In-Service Safety Reports that discussed a flaw in the altimeter installed in 787 aircraft, which Boeing traced in part to Spirit"); *id.* ¶ 597(b) (discussing an "In-Service Safety Report . . . that referenced a potential loose part"); *id.* ¶¶ 603–04; Defs.' Ex. 20; Defs.' Ex. 46.

[33] Am. Compl. ¶ 604 (italics omitted).

[34] *See id.* ¶ 581(b) (referencing a "SMS Implementation presentation to the [Aerospace Safety Committee] [discussing] a Speak Up report 'regarding possible incorrect fastener installation on 777-9 wing'").

rework—i.e., repairs to fix prior defects—and efforts to improve those metrics.[35]

The Audit Committee was responsible for oversight of, among other things, Boeing's "internal control environment and compliance with legal and regulatory requirements."[36] Its mandate included monitoring compliance with the DPA and FAA regulations. Every year, the Audit Committee received a Compliance Risk Management ("CRM") Report outlining key compliance risks, including aircraft certification and stamping noncompliance, and efforts to mitigate those risks.[37]

These channels presented the Board with information about Boeing's manufacturing challenges and efforts to address them. The Amended Complaint addresses seven topics.

1. **Workforce Productivity And Stability**.[38] Boeing, like many other companies, laid off and rehired a substantial number of employees due to the COVID-19 pandemic.[39] The Board was aware Boeing had experienced "a decrease in personnel with prior manufacturing experience and faced "the Toughest Recruiting Environment in Decades."[40] Management regularly

---

[35] *See, e.g., id.* ¶ 581(c) (referencing June 26, 2023 "'Special Attention' presentation to the [Aerospace Safety Committee] . . . disclos[ing] that [Boeing Commercial Airlines] experienced a '2.4% Increase in Rework % since 2022[.]'"); Defs.' Ex. 73 at -1612 (June 26, 2023 Special Attention presentation listing "Actions to Improve" to decrease rework levels, including "[c]ontinued focus on training effectiveness and simplifying work instructions").

[36] The Boeing Co., Proxy Statement (Schedule DEF14A) at 18 (Mar. 3, 2023).

[37] *See, e.g.,* Am. Compl. ¶¶ 480(i)–(j) (referencing 2022 and 2023 CRM Reports).

[38] *Id.* ¶¶ 34, 329, 473–76.

[39] *Id.* ¶¶ 34, 208–11.

[40] Am. Compl. ¶¶ 474(a)–(b).

8

updated the Board and its committees on efforts to ensure Boeing's workforce was appropriately trained.[41]

**2. Supplier Defects**.[42] Spirit AeroSystems Holdings, Inc. ("Spirit") was one of Boeing's key suppliers, responsible for producing approximately 70% of each 737 MAX aircraft.[43] In part due to exogenous supply chain and workforce disruptions,[44] Spirit allegedly suffered from quality issues resulting in the supply of defective products.[45] Management regularly updated the Board and its committees on those defects and the rework being performed to remedy them.[46] The updates also addressed management's broader initiatives to reduce supplier-side quality escapes, including a "Spirit One Quality Plan."[47] On top of monitoring management's initiatives, in

---

[41] *See, e.g.*, Defs.' Ex. 6 at -3168; Defs.' Ex. 136 at -2544; Defs.' Ex. 121 at -3229; Defs.' Ex. 122 at -0020.

[42] Am. Compl. ¶¶ 465–72.

[43] *Id.* ¶¶ 214–15.

[44] *See id.* ¶¶ 216–17 (describing the effects of the pandemic and a labor strike on Spirit's operations).

[45] *Id.* ¶¶ 216–18, 465.

[46] *See, e.g.*, *id.* ¶ 465(b) (reporting that "Boeing would set up approximately twelve repair stations across Boeing sites to perform rework" on "flaws in fuselages Boeing received from Spirit"); *id.* ¶ 465(c) (quoting April 18, 2023 BCA Update referencing a "Spirit escape involving a 737 MAX" and "nacelle rework impacts"); *id.* ¶ 465(d) (quoting April 18, 2023 BCA Update referencing a "737 Spirit Notice of Escapement (NoE) Initial Assessment" and disclosing management's assumption for a "[m]onthly rework max throughput at ~12 aircraft per month"); *id.* ¶ 465(e) (quoting April 24, 2023 Audit Committee materials disclosing "Boeing's need to 'perform rework' on 737 MAX fuselages" after Spirit flagged a "non-standard manufacturing process"); *id.* ¶ 465(f) (quoting April 26, 2023 Audit Committee materials disclosing the "costs of rework" related to "quality issue on certain parts" supplied by Spirit); *id.* ¶ 465(h) (quoting August 28, 2023 Audit Committee Watch Items list discussing the need for "an assessment of 'production and delivery impacts as well as inspection/rework requirements'" related to "737 MAX production issue caused by Spirit"); *id.* ¶ 465(i) (quoting October 16, 2023 Audit Committee Watch Items list disclosing "the Company was 'performing rework'" on aircraft impacted by a "problem identified by Spirit").

[47] *See, e.g.*, Defs.' Ex. 32 at -1027 (June 27, 2022 SMS Risk Register Report presenting metrics for supplier-generated defects and identifying open corrective actions, including a

9

October 2023, the Board authorized Boeing to invest $100 million into Spirit to address its liquidity and operational needs.[48]

**3. FOD.**[49] FOD refers to any item or debris improperly "left in Boeing aircraft" during the assembly process.[50] FOD can damage aircraft.[51] Management periodically updated the Board and its committees on FOD-per-aircraft data and corrective actions to reduce FOD, including improvements to tooling and internal inspection processes.[52]

**4. Rework And Traveled Work.**[53] Rework refers to repairs performed on prior defects,[54] and traveled work refers to production work performed out of sequence.[55] Both are "realistic" features of manufacturing operations: defects require rework, and delays along the assembly line require traveled

---

"Spirit One Quality Plan"); *id.* at -1028 (detailing further "[o]pportunities for supplier oversight, including improvements to Boeing's "Initial Product and Production System Validation"); Defs.' Ex. 93 at -7329–31 (April 18, 2023 BCA Update presenting mitigation efforts such as a "Supplier Summit," a "Supply Chain Engineering Initiatives team to evaluate defect data and proactively implement process changes," and a "NOE management team to address quality escapes from supply base into Boeing Quality Management System QMS"); Defs.' Ex. 103 at -7687 (October 17, 2023 BCA Update describing management's "[c]ontinuous [i]teration [and] [m]onitoring" of "Spirit disruption" and "[u]nderperforming suppliers").

[48] Am. Compl. ¶ 468; *see* Defs.' Ex. 131 at -0660–61.

[49] Am. Compl. ¶¶ 487–91.

[50] *Id.* ¶ 43.

[51] *Id.*

[52] *See, e.g.*, Defs.' Ex. 31 at -0760–62, -0783 (February 10, 2022 SMS Risk Register Report presenting recent FOD metrics and management's "[p]ath to [s]tability," including "[h]eat maps and documentation for chronic repeat findings."); Defs.' Ex. 32 at -1024 (June 27, 2022 SMS Risk Register Report presenting "[s]uccessful actions" to reduce FOD, including "[e]nhanced accountability for Clean-As-you-Go," "[s]trengthening internal inspection by expanding Gold Coin program (i.e., placing FOD intentionally on aircraft for discovery)," and "[i]mprovements to tooling (e.g., lighted vacuums, FODless drill . . . .)").

[53] Am. Compl. ¶¶ 509–23, 579–600.

[54] *Id.* ¶ 53.

[55] *Id.* ¶¶ 45, 509–11.

10

work.[56]  Management regularly updated the Board and its committees on rework and traveled work, and their root causes—i.e., supplier-side quality issues and the presence of FOD.[57]  Management's updates regularly addressed efforts to mitigate those root causes.[58]

**5.  Tools And Parts Control**.[59]  Boeing maintains internal controls ensuring all tools and parts are properly used and accounted for during the production process.  Ineffective tool control can lead to aircraft delivered with FOD; the use of nonconforming or "scrapped" parts can lead to aircraft unsafe for operation.[60]  Management kept the Board and its committees apprised of nonconformities[61] and initiatives to strengthen tools and parts control.[62]  Those initiatives included improvements to "tool check in and

---

[56] *Id.* ¶ 45 ("When work slated for one workstation was not performed on time, . . . . [the] work [] traveled with the airplane down the assembly line and had to be completed out of the sequence provided in the manufacturing plan."); *id.* ¶ 53 ("Jobs that were performed incorrectly had to be redone if defects were discovered."); NTSB Report at 95–96 ("For a complex manufacturing process such as Boeing's, where thousands of components are being integrated into a final assembly, it is realistic to expect that predefined plans may need to be adjusted at times to accommodate for manufacturing nonconformances." (bolding omitted)).

[57] *See, e.g.*, *id.* ¶ 519(d) (quoting June 27, 2023 BCA Update explaining that the "[s]upply chain [was] driving traveled work" for the 787 program); *id.* ¶ 581(a).

[58] *See id.*

[59] *Id.* ¶¶ 554–65.

[60] *Id.* ¶¶ 554, 595.

[61] *See, e.g.*, *id.* ¶ 597(b) (quoting April 17, 2023 In-Service Safety Report referencing "a potential loose part because of the use of an improper tool"); *id.* ¶ 597(c) (quoting June 26, 2023 In-Service Safety Report referencing "a potential loose part because of the use of an improper tool"); *id.* ¶ 562 (quoting August 28, 2023 Special Attention Report referencing "compliance risk related to unapproved parts installation escapes").

[62] *See, e.g.*, Defs.' Ex. 136 at -2546 (2022 CRM Report describing "[m]itigation plans . . . to address tool control across the enterprise"); Defs.' Ex. 6 at -3170 (2023 CRM Report explaining that "BCA is working to improve 'Lost tool Report' processes; tool check in and return processes; tool tracking using Radio Frequency Identification Database capabilities or serialization tools; and employee training and risk awareness").

return processes," "tool tracking," and "risk control plans regarding unapproved parts."[63]

**6.  ODA Unit Interference and Employee Retaliation**.[64]  After the 737 MAX crashes, and as required under the DPA, Boeing committed to fostering a "culture of ethics and compliance."[65]  To that end, Boeing created its Speak Up and Ombudsman programs for employees to report on unsafe practices confidentially, "without a fear of retaliation."[66]  The Board and its committees saw regular updates on the Speak Up program,[67] ODA interference risks,[68] and management's progress on a range of anti-retaliation initiatives.[69]

**7.  Deficient Recordkeeping**.[70]  Boeing relies on complete and accurate manufacturing records to certify its aircraft as airworthy.[71]  Fraud and safety risks can arise when, for instance, employees incorrectly "stamp" a required

---

[63] Defs.' Ex. 6 at -3170.

[64] Am. Compl. ¶¶ 524–53.

[65] *See id.* ¶¶ 25, 57; DPA, Attachment C ¶¶ 9–10.

[66] Am. Compl. ¶ 204.

[67] *See, e.g.*, *id.* ¶ 550 (citing December 7, 2023 SMS Implementation Update reporting a decrease in the volume of Speak Up reports in 2023 relative to 2022); Defs.' Ex. 62 at -1823 (December 7, 2023 Implementation Update reporting on "Speak Up Health"); Defs.' Ex. 67 at -1466 (April 17, 2023 SMS Implementation Update reporting on "actions . . . being implemented to address the process gaps" identified in the Speak Up program).

[68] *See, e.g.*, Defs.' Ex. 77 at -1144 (August 29, 2022 Special Attention Report disclosing the results of a 2022 survey of ODA unit members); Am. Compl. ¶¶ 542–44 (citing Defs.' Ex. 77 at -1144).

[69] *See, e.g.*, Defs.' Ex. 136 at -2522, -2536–37 (2022 CRM Report discussing "progress on a new anti-retaliation procedure," "[t]ailored mitigation strategies[,] and oversight processes"); Defs.' Ex. 6 at -3156 (2023 CRM Report discussing "a restructured ODA process for interference allegation intake, review, investigation, and FAA disclosure"); Defs.' Ex. 109 at -2306 (June 27, 2022 DPA Compliance Update reporting on management's "[r]eview of anti-retaliation program and policies").

[70] Am. Compl. ¶¶ 479–96.

[71] *See id.* ¶ 479.

12

manufacturing step as complete[72] or fail to maintain "removal records" documenting the removal and replacement of parts.[73] The Aerospace Safety and Audit Committees regularly received updates on recordkeeping compliance.[74] Those updates addressed management's efforts to monitor and mitigate recordkeeping deficiencies, including "root cause analys[e]s," "new mandatory training," tools "to track certification status," and "improved data analytics and dashboard visibility."[75]

## C.    The Door Plug Blowout

On January 5, 2024, a Boeing 737-9 MAX flying as Alaska Airlines Flight 1282 climbed out of Portland, Oregon bound for Ontario, California.[76] Just as it reached 15,000 feet, the left mid-cabin door plug flew off, leaving a gaping hole in the aircraft.[77] Seven passengers and a crew member sustained minor injuries.[78] The aircraft made a safe emergency landing back in Portland.[79]

---

[72] *Id.*

[73] *Id.* ¶ 492; NTSB Report at 45, 87.

[74] *See, e.g.*, *id.* ¶¶ 480(a)–(h) (quoting Aerospace Safety Committee materials reporting on stamping allegations); *id.* ¶¶ 480(i)–(j) (quoting 2022 and 2023 CRM Reports identifying "Manufacturing Certification and Stamping" as a compliance risk).

[75] Defs.' Ex. 136 at -2544 (2022 CRM Report); Defs.' Ex. 6 at -3149, -3168–69 (2023 CRM Report); *see also* Am. Compl. ¶¶ 480(b)–(c) (quoting Aerospace Safety Committee materials referencing a "corrective action plan entitled 'Mfg. Discipline: Certifications & Stamping Project'").

[76] Am. Compl. ¶ 278.

[77] *Id.* ¶¶ 278–79.

[78] *Id.* ¶¶ 280, 282; Am. Compl. Ex. D [hereinafter "NTSB Report"] at 6.

[79] Am. Compl. ¶ 283.

An investigation by the National Transportation Security Board ("NTSB") revealed the cause: the door plug was missing bolts.[80] The jet's fuselage, manufactured by Spirit, had arrived at Boeing's Renton, Washington 737 MAX factory with defective rivets that needed rework.[81] The rework required Boeing personnel to open the door plug by removing four bolts securing the plug to the fuselage. Nobody on the job that day was experienced in opening and closing door plugs.[82] The defective rivets were replaced, but the removed bolts were not.[83] The Boeing personnel closed the door plug without conducting a quality assurance inspection or creating records of the removals.[84] The jet was then delivered to Alaska Airlines.[85]

## D. Regulators Investigate And Boeing Responds.

Within hours of the incident, the FAA announced the NTSB would investigate and grounded 171 Boeing 737-9 MAX aircraft operated by U.S. airlines or in U.S.

---

[80] *See generally* NTSB Report; *see also* Am. Compl. ¶¶ 289–92.

[81] Am. Compl. ¶ 290.

[82] *Id.* ¶ 476; NTSB Report at 86–88.

[83] Am. Compl. ¶ 290; NTSB Report at 119.

[84] Am. Compl. ¶ 292; NTSB Report at 120.

[85] Am. Compl. ¶ 30.

territory.[86]  "The FAA also issued an Emergency Airworthiness Directive requiring operators to inspect aircraft before further flight."[87]

Within a day of the incident, the Aerospace Safety Committee met to discuss the known facts, the Company's initial response, and immediate next steps.[88]  On January 8, in cooperation with the FAA, Boeing issued a Multi-Operator Message ("MOM") with instructions for inspecting the grounded 737-9 MAX fleet before returning the aircraft to service.[89]  The Aerospace Safety Committee met again on January 10 and 12 to discuss preliminary inspection findings and to consider whether they presented broader production quality issues.[90]  The Aerospace Safety Committee planned to have some of its members participate in an onsite inspection of the Washington factory responsible for manufacturing the jet.[91]  That inspection took place on January 18.[92]

In the meantime, the FAA launched a formal investigation into the incident and into Boeing's compliance with FAA regulations (the "Special Audit").[93]  On

---

[86] *Id.* ¶ 297.

[87] *Id.*

[88] Defs.' Ex. 23.

[89] Am. Compl. ¶ 298; Defs.' Ex. 133 at -0676.

[90] Defs.' Ex. 24; Defs.' Ex. 133.

[91] Defs.' Ex. 24.

[92] Defs.' Ex. 25 at -8044.

[93] Am. Compl. ¶ 301; *see also* Am. Compl. Ex. L.

January 24, the FAA froze Boeing's planned 737 MAX production expansion and effectively capped production rates at thirty-eight planes per month.[94]  The next day, the Renton factory temporarily paused production as part of a quality stand-down.[95]  Over the next few months, Boeing held quality stand-downs across all of its BCA production lines.[96]

The same month as the door plug blowout, senior Boeing management discussed an acquisition of Spirit—a move intended to "improve the safety and quality of Boeing airplanes" and "promote supply chain stability."[97]  Negotiations proceeded throughout the spring.[98]  Negotiations focused on Spirit's need to divest certain assets involved in producing aircraft for Airbus SE ("Airbus"), a Boeing competitor.[99]  Airbus would not "pay anything to acquire its parts of Spirit" because "the deal was engineered largely to fit Boeing's needs."[100]  Spirit would end up paying $439 million in connection with the divestiture.[101]  On June 26, Boeing made its final, all-stock offer to acquire Spirit for $37.25 per share in Boeing common

---

[94] Am. Compl. ¶ 316.

[95] *Id.* ¶ 619.

[96] *Id.* ¶ 625.

[97] *Id.* ¶ 390.

[98] *Id.* ¶¶ 391–412.

[99] *Id.* ¶ 402.

[100] *Id.* ¶ 421.

[101] *Id.* ¶ 425(g).

stock, subject to an exchange ratio collar.[102] The boards of both parties approved the merger on June 30.[103] Spirit stockholders approved the merger on January 31, 2025.[104]

### E. Regulatory Findings

On March 4, 2024, the FAA announced the Special Audit was complete.[105] The FAA identified ninety-seven alleged instances of noncompliance, including "multiple instances where [Boeing and Spirit] allegedly failed to comply with manufacturing quality control requirements."[106] The FAA gave Boeing ninety days from March 4 to submit a corrective action plan[107] and expressed it would not lift Boeing's production cap until it was satisfied.[108] On April 29, management presented the first iteration of a "Comprehensive Product Safety & Quality Plan" to the Aerospace Safety Committee.[109] Boeing submitted a proposed correction action plan to the FAA a month later.[110]

---

[102] *Id.* ¶ 412.

[103] *Id.* ¶¶ 413–14.

[104] *Id.* ¶ 419.

[105] *Id.* ¶ 335.

[106] *Id.* ¶¶ 336–38.

[107] *Id.* ¶ 336.

[108] *Id.*

[109] *Id.* ¶¶ 642–43.

[110] *Id.* ¶ 356.

The DOJ performed its own investigation into the door plug blowout incident and concluded Boeing had breached the DPA.[111]  In July, Boeing and the DOJ filed a plea agreement (the "Plea Agreement") in federal court, under which Boeing would plead guilty to a felony charge.[112]  The court rejected the Plea Agreement, observing that the "Government has monitored Boeing for three years now" and "it is not clear what all Boeing has done to breach the [DPA]."[113]

On May 29, 2025, Boeing and the DOJ entered into a two-year Non-Prosecution Agreement (the "NPA").[114]  Among other things, the NPA required Boeing to pay another $444.5 million to the families and beneficiaries of the victims of the 2018 and 2019 crashes.[115]

On June 24, the NTSB issued its final report on the door plug blowout incident.[116]  The final report documented the probable cause of the incident as a series of production mishaps symptomatic of "systemic nonconformance issues."[117]

F.      The Door Plug Blowout Incident Inspires Lawsuits.

---

[111] *Id.* ¶¶ 429–430.

[112] *Id.* ¶ 430; *see* Plea Agreement.

[113] *Id.* ¶ 441; Defs.' Ex. 148 at 11.

[114] Am. Compl. ¶ 444; *see* Am. Compl. Ex. F [hereinafter "NPA"].

[115] NPA ¶ 11.

[116] Am. Compl. ¶¶ 426–27; *see* NTSB Report.

[117] Am. Compl. ¶ 428; NTSB Report at 122; *see also* Am. Compl. Ex. K.

While those events unfolded, on May 22, 2024, several Boeing stockholders filed a class action complaint in the United States District Court for the Eastern District of Virginia alleging federal securities violations (the "Federal Securities Action").[118] On September 6, that court denied the defendants' motion to dismiss.[119] The Federal Securities Action remains pending.

On October 21, 2024, Plaintiffs filed a joint amended verified stockholder derivative complaint in the Eastern District of Virginia (the "Federal Derivative Action"), asserting four counts.[120] Counts I and II are bad faith oversight claims.[121] Counts III and IV challenge the directors' roles in causing the Company to violate Sections 14(a) and 10(b) of the Securities and Exchange Act.[122] On December 20, the Eastern District of Virginia dismissed Counts I and II in the Federal Derivative Action, noting this Court "is a more appropriate venue to resolve [the] *Caremark* claims."[123]

So told, Plaintiffs turned to this Court. On February 5, 2025, Plaintiffs filed a verified shareholder derivative complaint in this action reasserting their *Caremark*

---

[118] Am. Compl. ¶ 448.

[119] *Id.* ¶ 453.

[120] *Id.* ¶ 449.

[121] *Id.*

[122] *Id.*

[123] *Id.* ¶ 455 (italics added).

19

claims.[124]  This action was consolidated with another oversight action filed on November 25, 2024, and I appointed Plaintiffs as lead plaintiffs on March 20.[125]

Plaintiffs filed the Amended Complaint on August 15, 2025, asserting three counts.[126]  Count I is a breach of fiduciary duty claim against ten of the twelve members of the Board (the "Director Defendants") pressing two bad faith oversight failures under *Caremark*.[127]  They point to the failure "to respond in good faith to red flags showing potential deficiencies in the mission-critical areas of airplane safety and regulatory compliance," and the implementation of "a production schedule that . . . could not be met safely and in compliance with the law."[128]  Count II asserts the same claim against thirteen officers (the "Officer Defendants").[129]  Count III is an unjust enrichment claim alleging Director Defendants and Officer Defendants "wrongfully received" incentive-based compensation tied to unsafe production targets and illusory commitments to safety.[130]

---

[124] D.I. 26.

[125] D.I. 1; D.I. 25; D.I. 39; D.I. 50.

[126] *See generally* Am. Compl.

[127] *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996); Am. Compl. ¶¶ 717–21.

[128] Am. Compl. ¶ 719.

[129] *Id.* ¶¶ 107, 724.

[130] *Id.* ¶¶ 728–30.

On September 24, Defendants moved to dismiss under Court of Chancery Rules 12(b)(2), 12(b)(6), and 23.1.[131] The parties briefed the motion by November 24.[132] I heard argument on May 22, 2026, and took the motion under advisement.[133]

## II. ANALYSIS

My analysis begins and ends with "the gating question of demand futility."[134] Under Rule 23.1, a derivative complaint must "state with particularity . . . any effort made by the plaintiff to obtain the desired action from the entity" and "the reasons for not obtaining the action or not making the effort."[135] Having failed to make a demand, Plaintiffs must plead particularized facts supporting an inference that "demand is excused because the directors are incapable of making an impartial decision regarding the litigation."[136] Otherwise, the derivative action must be dismissed. Demand futility is conducted claim by claim, director by director.[137]

---

[131] D.I. 93.

[132] D.I. 94; D.I. 131; D.I. 138.

[133] D.I. 151.

[134] *Conte ex rel. Skechers U.S.A., Inc. v. Greenberg*, 2024 WL 413430, at *5 (Del. Ch. Feb. 2, 2024), *aff'd*, 338 A.3d 1289 (Del. 2025).

[135] Ct. Ch. R. 23.1; *see Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000) ("Rule 23.1 is not satisfied by conclusory statements or mere notice pleading.").

[136] *United Food & Com. Workers Union & Participating Food Indus. Empls. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1054 n.146 (Del. 2021) (citing *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008)).

[137] *In re Vaxart, Inc. S'holder Litig.*, 2021 WL 5858696, at *15 (Del. Ch. Dec. 1, 2021) (quoting *Cambridge Ret. Sys. v. Bosnjak*, 2014 WL 2930869, at *4 (Del. Ch. June 26, 2014)); *see also Zuckerberg*, 262 A.3d at 1059.

21

Plaintiffs contend demand is futile because more than half of the Board faces a substantial likelihood of liability on the claims asserted both here and in the Federal Derivative Action.[138] The claims here are premised on oversight failures sounding in the "fiduciary duty of loyalty, and specifically its subsidiary element of bad faith."[139] The claims in the Federal Derivative Action are premised on disclosure-related federal securities violations. I conclude neither set of claims impugns the Board's ability to impartially consider a demand for the *Caremark* claims here.

## A. The Breach Of Fiduciary Duty Claims

I begin with whether the Director Defendants face a substantial likelihood of liability on Plaintiffs' *Caremark* claims. Plaintiffs allege the Board saw "dozens of red flags" warning of systemic airplane manufacturing issues leading up to the door plug blowout incident.[140] They allege the Board ignored these red flags and, to make matters worse, implemented a production schedule that pushed profits over safety.[141]

Delaware law presumes directors perform their duties, including their oversight responsibilities, "in good faith and with reasonable care, even if their actions turn out poorly in hindsight."[142] That includes their responses to reporting

---

[138] *See Zuckerberg*, 262 A.3d at 1059; Am. Compl. ¶ 17.

[139] *Bricklayers Pension Fund of W. Pa. ex rel. Centene Corp. v. Brinkley*, 2024 WL 3384823, at *13 (Del. Ch. July 12, 2024).

[140] D.I. 131 [hereinafter "PAB"] 9.

[141] PAB 40.

[142] *In re Transunion Deriv. S'holder Litig.*, 324 A.3d 869, 884 (Del. Ch. 2024).

of significant legal and compliance risks: those responses are "presumed to [have been made] loyally, in good faith."[143]

*Caremark* imposes liability for bad faith amounting to a breach of the duty of loyalty.[144] "*Caremark* liability centers on a particular type of bad faith: 'intentional dereliction of duty' or 'conscious disregard for one's responsibilities'."[145] "Only 'a sustained or systematic failure of the board to exercise oversight . . . will establish the lack of good faith that is a necessary condition to liability.'"[146] The directors must know that they were not discharging their fiduciary obligations.[147]

*Caremark*'s scienter requirement differentiates disloyal bad faith from gross negligence that breaches the duty of care. "[A] failure to act in good faith requires

---

[143] *In re McDonald's Corp. S'holder Deriv. Litig.*, 291 A.3d 652, 679 (Del. Ch. 2023); *accord Clem v. Skinner*, 2024 WL 668523, at *8 (Del. Ch. Feb. 19, 2024) (explaining "the court's role is not to second-guess a board's response to a red flag," and further stating that "[c]laims that quibble with the timing or success of corrective action necessarily fail").

[144] *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 369–70 (Del. 2006); *see also Marchand v. Barnhill*, 212 A.3d 805, 824 (Del. 2019) ("If *Caremark* means anything, it is that a corporate board must make a good faith effort to exercise its duty of care. A failure to make that effort constitutes a breach of the duty of loyalty."); *Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003) ("A director cannot act loyally towards the corporation unless she acts in the good faith belief that her actions are in the corporation's best interest.").

[145] *Skechers*, 2024 WL 413430, at *7 (internal quotation marks omitted) (quoting *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 66 (Del. 2006)); *see also Lyondell Chemical Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009) ("[T]here is a vast difference between an inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those duties.").

[146] *Clem*, 2024 WL 668523, at *7 (quoting *Caremark*, 698 A.2d at 971).

[147] *Stone*, 911 A.2d at 370.

conduct that is qualitatively different from, and more culpable than, the conduct giving rise to a violation of the fiduciary duty of care (i.e., gross negligence)."[148] In the corporate context, "gross negligence has acquired its own, special meaning and requires conduct akin to recklessness."[149] "[D]irector gross negligence with respect to a corporate trauma is insufficient to establish director liability."[150] Fiduciaries "who 'try' to implement and attend to a 'reasonable board-level system of monitoring and reporting' have met their baseline duty."[151] Even in the context of "mission critical" operations, "*Caremark* does not demand omniscience."[152] The Court does not imply bad faith retroactively to a director who, when evaluating a legal risk, believed in good faith that she was acting lawfully and taking good faith

---

[148] *In re Goldman Sachs Gp., Inc. S'holder Litig.*, 2011 WL 4826104, at *13 (Del. Ch. Oct. 12, 2011) (citing *Stone*, 911 A.2d at 369).

[149] *PJT Holdings, LLC v. Costanzo*, 339 A.3d 1231, 1249 (Del. Ch. 2025) (further clarifying that "[b]y statute, Delaware has defined recklessness as a situation where 'the person is aware of and consciously disregards a substantial and unjustifiable risk that the element exists or will result from the conduct'").

[150] *Constr. Indus. Laborers Pension Fund v. Bingle*, 2022 WL 4102492, at *8 (Del. Ch. Sept. 6, 2022), aff'd, 297 A.3d 1083 (Del. 2023); *see also Off. Comm. of Unsecured Creditors of Integrated Health Servs. v. Elkins*, 2004 WL 1949290, at *12 (Del.Ch. Aug. 24, 2004) ("[I]t is important to highlight yet again that the [*Disney*] standard moves beyond gross negligence. To survive a motion to dismiss based on this standard, where the charter contains a § 102(b)(7) provision, a plaintiff must plead facts that, if true, would imply that a Board '*consciously and intentionally disregarded [its] responsibilities.*'" (referencing *In re Walt Disney Co. Deriv. Litig.*, 825 A.2d 275, 289 (Del. Ch. 2003))).

[151] *Transunion*, 324 A.3d at 884 (quoting *Marchand*, 212 A.3d at 821).

[152] *In re Clovis Oncology, Inc. Deriv. Litig.*, 2019 WL 4850188, at *13 (Del. Ch. Oct. 1, 2019) (quoting *Marchand*, 212 A.3d at 824).

steps to remedy noncompliance.[153]  "[T]here is a vast difference between an inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those duties.  There is an even wider gulph between imperfect compliance and purposeful lawbreaking."[154]  In other words, directors do not face oversight liability if they believed they were reasonably performing their duties in stockholders' best interests.

Bad faith manifests along a spectrum.[155]  Directors might have "utterly failed to implement any reporting or information system or controls" or, "having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention."[156]  In their most extreme form, *Caremark* claims can allege

---

[153] *See McDonald's*, 291 A.3d at 680 ("The decision about what to do in response to a red flag is one that an officer or director is presumed to make loyally, in good faith, and on an informed basis, so unless one of those presumptions is rebutted, the response is protected by the business judgment rule.").

[154] *Transunion*, 324 A.3d at 895 (citations omitted); *see also Firemen's Ret. Sys. of St. Louis ex rel. Marriott Int'l, Inc. v. Sorenson*, 2021 WL 4593777, at *16 (Del. Ch. Oct. 5, 2021) ("An attempted yet failed remediation effort generally cannot implicate bad faith."); *see also Wayne Cnty. Empls.' Ret. Sys. v. Corti,* 2009 WL 2219260, at *14 (Del. Ch. July 24, 2009) ("Bad faith cannot be shown by merely showing that the directors failed to do all they should have done under the circumstances." (citing *Lyondell*, 970 A.2d at 243 )); *see also In re Qualcomm Inc. FCPA S'holder Deriv. Litig.*, 2017 WL 2608723, at *3 (Del. Ch. June 16, 2017) ("Further, '[s]imply alleging that a board incorrectly exercised its business judgment and made a 'wrong' decision in response to red flags . . . is insufficient to plead bad faith.'" (citing *Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 131 (Del. Ch. 2009)).

[155] *See Transunion*, 324 A.3d at 886.

[156] *Stone*, 911 A.2d at 370.

that directors "purposely caused the corporation to break the law in pursuit of greater profits."[157]

Another distinction is relevant here. "[A]s relates to *Caremark* liability, it is appropriate to distinguish the board's oversight of the company's *management of business risk* that is inherent in its business plan from the board's oversight of the company's *compliance with positive law*—including regulatory mandates."[158] For example, "absent statutory or regulatory obligations, how much effort to expend to prevent criminal activities by third parties against the corporate interest requires an evaluation of business risk, the quintessential board function."[159] "Business risks

[157] *Transunion*, 324 A.3d at 886; *see In re Massey Energy Co.*, 2011 WL 2176479, at *20 (Del. Ch. May 31, 2011) ("[A] fiduciary of a Delaware corporation cannot be loyal to a Delaware corporation by knowingly causing it to seek profit by violating the law." (citations omitted)).

[158] *Clovis*, 2019 WL 4850188, at *12; *see also Citigroup*, 964 A.2d at 131 ("While it may be tempting to say that directors have the same duties to monitor and oversee business risk, imposing *Caremark*-type duties on directors to monitor business risk is fundamentally different.")

[159] *Bingle*, 2022 WL 4102492, at *1, *7 ("While no case in this jurisdiction has imposed oversight liability based solely on failure to monitor business risk, it is possible, I think, to envision an extreme hypothetical involving liability for bad faith actions of directors leading to such liability."); *see Citigroup*, 964 A.2d at 126 ("To the extent the Court allows shareholder plaintiffs to succeed on a theory that a director is liable for a failure to monitor business risk, the Court risks undermining the well settled policy of Delaware law by inviting Courts to perform a hindsight evaluation of the reasonableness or prudence of directors' business decisions."); *see also Marchand*, 212 A.3d at 821 (noting that directors have "great discretion to design context- and industry-specific approaches tailored to their companies' businesses and resources").

are shades of gray; legal compliance risks are black and white."[160] Business matters are often complex, without a clear correct answer; so "[i]t is almost impossible for a court, in hindsight, to determine whether the directors of a company properly evaluated risk and thus made the 'right' business decision."[161] By contrast, regulations and statutory obligations provide clear guidance for directors overseeing legal risk; "[d]irectors lack the discretion 'to consciously cause the corporation to act unlawfully.'"[162]

Against the presumption of good faith, *Caremark*'s scienter requirement, and the distinction between business risk and legal risk, Plaintiffs try to plead Boeing's directors should face liability for their oversight of Boeing's manufacturing risks as realized in the door plug incident. Even reading with a plaintiff-friendly eye, Plaintiffs have failed to plead the crux of *Caremark*: bad faith.

### 1. Plaintiffs Fail To Plead Red Flags Supporting An Inference Of Bad Faith.

---

[160] *In re ProAssurance Corp. S'holder Deriv. Litig.*, 2023 WL 6426294, at *14 (Del. Ch. Oct. 2, 2023); *see also Transunion*, 324 A.3d at 887 ("For liability to attach, the risks identified and ignored cannot be business matters on which deference to the directors' decision-making is owed. They must be legal violations so obvious and material that disregarding them amounts to bad faith." (footnotes omitted)).

[161] *Citigroup*, 964 A.2d at 126; *see Segway Inc. v. Cai*, 349 A.3d 628, 634 (Del. Ch. 2023) ("The *Caremark* doctrine is not a tool to hold fiduciaries liable for everyday business problems.").

[162] *ProAssurance*, 2023 WL 6426294, at *14 (quoting *Desimone v. Barrows*, 924 A.2d 908, 934–35 (Del. Ch. 2007)).

Plaintiffs' *Caremark* theory is premised on the Board's inaction upon receipt of "dozens" of alleged "red flags" concerning systemic manufacturing issues.[163] As the Amended Complaint details, Boeing elevated airplane safety into a standing item discussed at every Board and Aerospace Safety Committee meeting.[164] The Audit Committee, too, monitored Boeing's compliance with the DPA and FAA regulations.[165] Each of these bodies received routine reports on airplane safety. And each of those routine reports kept the Board abreast of virtually every key operational risk, including: (1) workforce productivity and stability;[166] (2) risks related to "rework" and "traveled work" during Boeing's manufacturing process;[167] (3) foreign object debris left inside aircraft;[168] (4) supply chain issues;[169] (5) allegations of

---

[163] PAB 9, 35.

[164] *See* Am. Compl. ¶ 697.

[165] *See, e.g.*, *id.* ¶¶ 497, 699–701.

[166] *Id.* ¶¶ 473–76; *see, e.g.*, Defs.' Ex. 6 at -3168; Defs.' Ex. 136 at -2544; Defs.' Ex. 121 at -3229; Defs.' Ex. 122 at -0020.

[167] Am. Compl. ¶¶ 509–23, 579–600; Defs.' Ex. 101 at -7446; Defs.' Ex. 105 at -7911.

[168] Am. Compl. ¶¶ 487–91; *see, e.g.*, Defs.' Ex. 31 at -0760–62; -0783, Defs.' Ex. 32 at -1024.

[169] Am. Compl. ¶¶ 465–72; *see, e.g.,* Defs.' Ex. 93 at -7321; Defs.' Ex. 101 at -7446; Defs.' Ex. 103 at -7681.

retaliation against whistleblowers and quality inspectors;[170] (6) mismanagement of tools and parts;[171] and (7) deficient recordkeeping.[172]

From that reporting, Plaintiffs present ninety-five pages of allegations reciting routine board and committee reports, presentations, and updates delivered over a three-year period.[173] According to Plaintiffs, those ninety-five pages are not exhaustive.[174] Plaintiffs contend nearly every update the Director Defendants received about Boeing's manufacturing risks amounted to a red flag.

The breadth of Plaintiffs' theory risks recasting the volume and depth of Boeing's reporting from a best practice into evidence of disloyalty.[175] *Caremark* "is rightly seen as a prod towards the greater exercise of care by directors in monitoring their corporations' compliance with legal standards."[176] It sets a baseline requirement for "boards to take corporate compliance seriously."[177] It is not an

---

[170] Am. Compl. ¶¶ 524–53. The Amended Complaint details several anecdotal accounts of alleged retaliation against whistleblowers. *Id.* ¶¶ 524–40. Plaintiffs do not plead the Board knew of those accounts; nor do they plead bad faith in failing to implement reporting or information systems or controls that would have informed the Board. I do not consider those accounts as part of Plaintiffs' red flags claim.

[171] *Id.* ¶¶ 554–65; *see, e.g.*, Defs.'Ex. 101 at -7439, Defs.' Ex. 6 at -3170.

[172] Am. Compl. ¶¶ 479–81; *see, e.g.,* Defs.' Ex. 136 at -2544–45; Defs.' Ex. 150.

[173] PAB 10 n.2; *see* Am. Compl. ¶¶ 463–610.

[174] PAB 10 n.2.

[175] *See Guttman*, 823 A.2d at 506.

[176] *Id.* (footnote omitted).

[177] *Transunion*, 324 A.3d at 884.

avenue to hold corporate fiduciaries personally liable for doing what *Caremark* requires them to do—to make a "good faith effort to implement an oversight system and then monitor it."[178] And as Defendants point out, "if everything is a red flag, then nothing is."[179]

More fundamentally, under a *Caremark* red-flag claim, liability will not attach unless the plaintiffs plead warning signs bright enough to put the board on notice that "the corporation was violating the law or otherwise headed for a corporate trauma."[180] A "red flag" is not a catch-all for every risk faced by a company and reported to its fiduciaries.[181] An alleged red flag must inspire "a need to act so clear

---

[178] *Marchand*, 212 A.3d at 821.

[179] D.I. 138 at 1.

[180] *Ontario Provincial Council of Carpenters' Pension Tr. Fund v. Walton*, 2023 WL 3093500, at *32 (Del. Ch. Apr. 26, 2023); *see also Bingle*, 2022 WL 4102492, at *10 (explaining that the plaintiffs must plead "red flags so vibrant that scienter is implied"); *Transunion*, 324 A.3d at 887 (explaining that "the risks identified . . . must be legal violations so obvious and material that disregarding them amounts to bad faith." (citation omitted)); *Rich ex rel. Fuqi Int'l, Inc. v. Yu Kwai Chong*, 66 A.3d 963, 983 (Del. Ch. 2013) (describing "red flags" as "obvious and problematic occurrences").

[181] *See, e.g.*, *Reiter*, 2016 WL 6081823, at *9 (rejecting a "diffuse" theory of liability contending "the numerous reports that were provided regularly to the Capital One directors from June 2011 to January 2015 constituted a series of red flags that should have triggered a duty for the board to act"); *see also Marriott*, 2021 WL 4593777, at *1 (rejecting a theory of liability contending "updates to the Board about aspects of Starwood's cybersecurity measures that needed improvement" were "red flags").

that to ignore it implies a conscious disregard of duty."[182]  And the red flags must imply misconduct similar to that which caused the corporate trauma.[183]

Here, many of the purported "red flags" spoke to business risk, not legal risk.[184]  The Board knew Boeing emerged from the pandemic with a "[n]ew and inexperienced workforce" and had faced the "Toughest Recruiting Environment in Decades."[185]  The Board also knew unforeseen defects discovered along the supply chain required rework,[186] and unpredictable delays in the manufacturing process

---

[182] *In re MetLife Inc. Deriv. Litig.*, 2020 WL 4746635, at *18 (Del. Ch. Aug. 17, 2020).

[183] *Melbourne Mun. Firefighters' Pension Tr. Fund ex rel. Qualcomm, Inc. v. Jacobs*, 2016 WL 4076369, at *8 (Del. Ch. Aug. 1, 2016) ("The subsequent complained-of 'corporate trauma,' however, must be sufficiently similar to the misconduct implied by the 'red flags'." (citation omitted)); *see In re Dow Chem. Co. Deriv. Litig.*, 2010 WL 66769, at *13 (Del. Ch. Jan. 11, 2010) (stating that the relationship between the red flag and the corporate trauma cannot be "too attenuated); *see also Clem*, 2024 WL 668523, at *9 (dismissing purported red flags "untethered from the particular wrongdoing at issue"); *In re Clovis*, 2019 WL 4850188, at *15 n.217 (noting "Plaintiffs may have difficulty connecting the oversight failure(s) to the corporate trauma"); *see also City of Detroit Police & Fire Ret. Sys. v. Hamrock,* 2022 WL 2387653, at *20 (Del. Ch. June 30, 2022) ("For a red-flag theory to work, the red flag must be sufficiently connected to the corporate trauma at issue to elevate the board's inaction in the face of the red flag to the level of bad faith.").

[184] *See Reiter*, 2016 WL 6081823, at *13 (dismissing *Caremark* claim where "the core factual allegations of the Complaint do not amount to red flags of illegal conduct"); *Goldman Sachs*, 2011 WL 4826104, at *20 ("Legal, if risky, actions that are within management's discretion to pursue are not 'red flags' that would put a board on notice of unlawful conduct.").

[185] Am. Compl. ¶¶ 234, 273; *see also id.* ¶¶ 474(e)–(f) (discussing reports from Deloitte to the Audit Committee identifying "'workforce productivity' as a challenge to Boeing management's financial estimates").

[186] *See, e.g., id.* ¶ 465(b) (board report explaining that "Boeing would set up approximately twelve repair stations across Boeing sites to perform rework" on "flaws in fuselages Boeing received from Spirit"); *id.* ¶ 465(c) (BCA Update disclosing management's assessment of

31

sometimes required out-of-sequence traveled work.[187] Plaintiffs allege those issues may invite human and manufacturing error.[188] Updates addressing such "[g]eneral risks" may be "evidence that the reporting system is working as it should."[189]

Some of the purported "red flags" were not "waved in front of the Defendants."[190] Plaintiffs allege the Board "received numerous red flags" concerning employee failures to maintain FAA-mandated removal records.[191] The only identified "red flags" for that issue are the 2022 and 2023 CRM Reports stating Boeing had received "Letters of Investigation," "notices of Formal Compliance Actions," and "notices of Formal Corrective Action from the FAA."[192] Plaintiffs do not plead the Board was "aware of the exact subject" of those compliance

---

a "Spirit escape involving a 737 MAX" and "nacelle rework impacts"); *id.* ¶ 465(d); *id.* ¶ 465(e) (Audit Committee presentation disclosing "Boeing's need to 'perform rework' on 737 MAX fuselages" after Spirit flagged a "non-standard manufacturing process").

[187] *See* NTSB Report at 95–96 ("For a complex manufacturing process such as Boeing's, where thousands of components are being integrated into final assembly, it is realistic to expect that predefined plans may need to be adjusted at times to accommodate for manufacturing nonconformances.").

[188] *See* Am. Compl. ¶¶ 45–46, 53, 476.

[189] *Hamrock,* 2022 WL 2387653, at *25.

[190] *Oklahoma Firefighters Pension & Ret. Sys. v. Corbat*, 2017 WL 6452240, at *21 (Del. Ch. Dec. 18, 2017); *see also Wood*, 953 A.2d at 143 ("Under Delaware law, red flags 'are only useful when they are either waved in one's face or displayed so that they are visible to the careful observer.'" (quoting *In re Citigroup Inc. S'holders Litig.*, 2003 WL 21384599, at *2 (Del. Ch. June 5, 2003))).

[191] *See* Am. Compl. ¶¶ 494–95.

[192] *Id.* ¶ 495.

actions.[193]  Instead, Plaintiffs draw that inference in hindsight from language in the Plea Agreement—namely, that "[s]ince 2019, the FAA has issued numerous formal or informal actions to Boeing related to Boeing's policy governing removals."[194] Nothing in that language implies the Board knew of those particular actions, what they were about, or that Boeing's policy governing removals was inadequate.[195]

Nor were Defendants shown red flags concerning noncompliant stamping— incorrectly certifying a required step or inspection as completed in conformance with requirements.  Plaintiffs fashion a red flag out of the 2022 and 2023 CRM reports identifying "Production & Quality" as a high-priority risk, with "Manufacturing Certification and Stamping" as part of that category, and disclosing the problem was ongoing.[196]  But those materials also report management was extremely attentive to the issue:  the reports did not disclose a need for board action.  As Plaintiffs allege, the 2022 CRM Report followed months of reports identifying "stamping allegations"

---

[193] *Centene*, 2024 WL 3384823, at *18.

[194] *See* Am. Compl. ¶ 494.

[195] *See Centene*, 2024 WL 3384823, at *17–18 ("Indeed, nothing in the record suggests that the directors knew of the . . . conduct the Ohio attorney general was investigating."); *id.* at *18 ("Plaintiff does not allege the Board was aware of the exact subject of those inquiries.").

[196] Am. Compl. ¶¶ 480(i)–(j) (citing Defs.' Ex. 136 at -2053, -2056, -2544–45; Defs.' Ex. 6 at -3143, -3146).

as a "[m]oderate" risk[197] subject to ongoing "corrective action plan[s]."[198] Management informed the Aerospace Safety Committee about the company's two open corrective action plans: the Process Noncompliance and Stamping Project Plan and the Mfg. Discipline: Certifications & Stamping Project.[199] The 2022 CRM Report detailed Boeing's work on the issue "throughout 2022:" "extensive root cause analysis," "new mandatory training," "tools to enhance production floor visibility," "simplified work process instructions and change processes," and "prioritized stamping-related messaging."[200] Still, as the 2023 CRM materials reported, stamping noncompliance remained "steady" from 2021 through 2023, and that those efforts had "not yet show[n] meaningful improvement."[201] The 2023 CRM Report explained Boeing had "devoted considerable attention to identifying root causes and implementing improvements," that "extensive" work had revealed a considerable contributing factor was "employee confusion and misunderstanding and processes," and so Boeing had "significantly increased communications and training" and enhanced visibility.[202] Even with a plaintiff-friendly eye, the Board

---

[197] *Id.* ¶¶ 480(b)–(e).

[198] *Id.* ¶¶ 480(a)–(e).

[199] *Id.* ¶¶ 480(a)–(b).

[200] Defs.' Ex. 136 at -2544–45.

[201] Defs.' Ex. 6 at -3168.

[202] *Id.*

received reporting on an ongoing risk that management was working up and iteratively addressing, not a red flag of persistent noncompliance requiring board action to avoid illegality and traumatic consequences.

Finally, some of the purported "red flags" are insufficiently tethered to the corporate trauma at issue. Red flags must be "sufficiently similar" to "the corporate trauma in question" such that the board's conscious inaction "proximately caused that trauma."[203] "General risks are not 'red flags' of a specific corporate trauma."[204]

The Board regularly received updates on a swathe of potential noncompliance risks that Boeing monitors every day. Those updates disclosed FOD levels above Boeing's internal control line,[205] compliance risks related to the installation of "unapproved parts,"[206] internal audit findings indicating deficient "tool inventory control[s],"[207] and allegations of retaliation against ODA unit members.[208] Plaintiffs

---

[203] *Hamrock*, 2022 WL 2387653, at *20 (internal quotation marks omitted); *see Clem*, 2024 WL 668523, at *9–10 (dismissing a *Caremark* claim premised in part on purported red flags "untethered from the particular wrongdoing at issue").

[204] *Hamrock*, 2022 WL 2387653, at *25 (citations omitted).

[205] *See* Am. Compl. ¶¶ 488–489 (discussing Board presentations disclosing foreign object debris levels on storage and newly produced aircraft).

[206] *Id.* ¶ 562.

[207] *Id.* ¶ 597(a).

[208] *See id.* ¶¶ 542–45; *see also id.* ¶ 546 (referencing 2023 CRM Report identifying "interference with ODA Unit members" as a "risk" and explaining the risk rating "reflects ongoing regulatory developments that impose new or modified compliance burdens on Boeing, as well as a sustained level of compliance escapes, including allegations of interference against ODA unit members" (italics omitted)).

35

do not plead any of these risks contributed to the door plug incident, or any recent safety incident for that matter. At best, they plead that each of those underlying issues can pose safety risks generally. That is not enough to plead they amounted to red flags warning of the door plug blowout, the DPA breach, or any fallout therefrom.

Even drawing all reasonable inferences in Plaintiffs' favor, the Amended Complaint pleads yellow flags concerning general operational risks, yellow flags coupled with management's responses, and reporting on risks that had nothing to do with the door plug incident or the DPA violations.[209] It offers no grounds to infer a bad faith dereliction of duty upon receipt of information requiring board action.

### 2. Plaintiffs Fail To Plead Boeing's Production Targets Were Implemented In Bad Faith.

Plaintiffs half-heartedly press a bad faith claim styled after *In re Massey Energy Co.*[210] They see bad faith in the Board's approval of "aggressive production schedules that Boeing could not safely or legally meet."[211] Plaintiffs' theory is that Boeing consciously "shirk[ed] regulatory compliance in favor of higher profits."[212]

---

[209] *See Reiter*, 2016 WL 6081823, at *13 (holding that the numerous reports were "at most flags of a different hue, namely yellow flags of caution").

[210] 2011 WL 2176479, at *1.

[211] PAB 1.

[212] Am. Compl. ¶ 706.

Plaintiffs seem to know this case is not *Massey*. *Massey*'s facts were extreme. The plaintiffs there pled the company's board was dominated by a CEO who "knowingly flouted applicable miner safety laws," caused the company "to take an openly aggressive attitude with [its regulators]," and "made the conscious choice to put miners at risk in order to cut cost-corners."[213] On those facts, the Court found it reasonably conceivable that the company's fiduciaries, in bad faith, "made a business out of breaking the law."[214]

Plaintiffs do not plead any "defiant and adversarial relationship to the law."[215] They do not assert the production targets broke the law at all. They simply ask the Court to infer bad faith from the Board's choice to maintain Boeing's production targets despite the information they received.[216] But monthly airplane production goals, and how to oversee general operational risks associated with those targets, are business decisions afforded a presumption of good faith.[217] As explained, Plaintiffs did not plead red flags displacing that presumption.[218] It is unreasonable, and against

---

[213] *Massey*, 2011 WL 2176479, at *19.

[214] *Hamrock*, 2022 WL 2387653, at *19 (discussing *Massey*).

[215] *Corbat*, 2017 WL 6452240, at *24.

[216] PAB 40–41.

[217] *See Corbat*, 2017 WL 6452240, at *18 ("[E]valuation of risk is a core function of the exercise of business judgment." (citing *Citigroup*, 964 A.2d at 126)).

[218] *See Ritchie ex rel. Corcept Therapeutics, Inc. v. Baker*, 2025 WL 2048014, at *13 (Del. Ch. July 22, 2025) (finding no substantial likelihood of liability for bad faith oversight failures where "the Complaint [fell] short of alleging red flags that should have alerted the

Delaware's good faith presumption, to infer that because the Board knew Boeing faced general safety risks, and because those risks materialized in loss, the Board "*knew* [Boeing's production targets] could not be met safely and in compliance with the law."[219]

And in any case, the pleading-stage record precludes the inference Plaintiffs seek. Boeing keyed its production to informed assessments of risk and feasibility. For instance, the Amended Complaint pleads that in December 2022, management presented "Staffing," "Quality," "Supply Chain," and "Factory Health" as yellow- and red-coded risks for Boeing's 737 MAX production rate.[220] The same presentation then noted management decided to push back its 2023 long-range plan target deadlines by months.[221] In April 2023, management presented "Supplier disruptions," "Delivery performance," and "Rate ramp execution" as yellow-coded risks.[222] The same presentation then explained management's efforts to achieve

---

Director Defendants to an illegal scheme, let alone that the Director Defendants knew about and purposely caused the violations").

[219] Am. Compl. ¶ 691 (emphasis added).

[220] *Id.* ¶ 235.

[221] *Compare id.* (December 2022 presentation forecasting 737 MAX production rate of thirty-eight planes per month by mid-2023), *with id.* ¶ 229 (April 2022 presentation forecasting 737 MAX production rate of thirty-eight planes per month by the end of 2022).

[222] *Id.* ¶ 240.

"production stability"[223] and concluded Boeing's target production rate was "proceeding with manageable risk."[224]

Plaintiffs' allegations also demonstrate Boeing's production targets were flexible.[225] Plaintiffs allege management made "[m]inor updates" to Boeing's 2023 long-range plan in view of the Company's "inability to keep its proposed production schedule."[226] And they allege "Boeing sometimes delayed a [production] rate increase" when "defect[s] or regulatory order[s]" so required.[227] Occasional delays in production ramp-ups, in Plaintiffs' words, "became a theme."[228] These allegations support, rather than refute, the presumption that the Board exercised good faith business judgment in setting production targets and delaying them when necessary. Plaintiffs have failed to plead particularized facts supporting an inference of bad faith.

---

[223] Defs.' Ex. 93 at -7331 (explaining that Boeing "[e]stablished Supply Chain Engineering Initiatives team to evaluate defect data and proactively implement process changes" and "[d]eveloped [notice of escapement] management team to address quality escapes from supply base into Boeing Quality Management System QMS").

[224] *Id.* at -7330.

[225] *See, e.g.*, Am. Compl. ¶¶ 236–37; Defs.' Ex. 96 at -6507 (noting "3 [737] production pauses in 2022, 19 airplanes behind master schedule at rollout"); Defs.' Ex. 97 at -6692 (noting "[d]elay[] [in] 737 rate 38 to May 2023"); Defs.' Ex. 99 at -6892 (noting "Spirit performance may require small adjustments to . . . 737 rates 42 and above").

[226] Am. Compl. ¶ 236.

[227] *Id.* ¶ 237.

[228] *Id.*

## B. The Unjust Enrichment Claim

Plaintiffs' unjust enrichment claim centers on Defendants' compensation during the relevant time period. They allege Defendants took home millions in incentive-based compensation tied to untenable production and financial targets, and illusory commitments to safety.[229] Plaintiffs concede the unjust enrichment claim rises and falls with the breach of fiduciary duty claims.[230] Given their failure to plead a substantial likelihood of liability on the latter, the former must also fail.

## C. The Federal Derivative Action Claims

Plaintiffs' final attempt at pleading demand futility looks to the remaining claims in the Federal Derivative Action, which alleges violations of Sections 10(b) and 14(a) of the Exchange Act. Both claims survived a motion to dismiss in December 2024.[231] Plaintiffs contend that given the Exchange Act claims survived dismissal and share "common facts" with the claims in this action, the Director

---

[229] *Id.* ¶¶ 458–60, 728.

[230] PAB 59; *see Fisher ex rel. LendingClub Corp. v. Sanborn*, 2021 WL 1197577, at *21 (Del. Ch. Mar. 30, 2021) (finding that the unjust enrichment claim "[fell] with the viability of the breach of fiduciary duty claim"); *MetLife*, 2020 WL 4746635, at *18 (dismissing an unjust enrichment claim "premised on the unjustness of compensation in light of the Director Defendants' bad-faith failure of oversight" where the *Caremark* claim failed as well).

[231] Am. Compl. ¶ 711; Am. Compl. Ex. P.

Defendants' exposure to liability in the Federal Derivative Action compromises their ability to impartially consider a demand here.[232]  Not so.

To be sure, Delaware jurisprudence contains examples of sustained federal claims that support a substantial likelihood of liability on breach of fiduciary duty claims.  In *Pfeiffer v. Toll*, a federal court concluded a securities action sufficiently alleged securities fraud not only in disclosure violations, but also in "insider trading of the individual defendants [that] . . . raised a 'powerful and cogent inference of *scienter*' and was 'unusual in scope and timing.'"[233]  Then this Court considered "essentially the same trades" in a *Brophy* claim.[234]  Given the federal court's specific adjudication of bad faith in those trades, this Court concluded it was "not possible" for the federal defendants, who comprised a majority of the demand board, to impartially consider a demand on the *Brophy* claim.[235]

That same two-step played out in *In re Fitbit, Inc. Stockholder Derivative Litigation*.[236]  This Court was evaluating whether a majority of the board faced a substantial likelihood of liability on *Brophy* claims based on their knowledge that

---

[232] PAB 54–56; *see Pfeiffer v. Toll*, 989 A.2d 683, 689–90 (Del. Ch. 2010), *abrogated on other grounds by Kahn v. Kolberg Kravis Roberts & Co., L.P.*, 23 A.3d 831 (Del. 2011).

[233] 989 A.2d at 690 (quoting *City of Hialeah Empls. Ret. Sys. & Laborers Pension Tr. Funds v. Toll Bros., Inc.*, 2008 WL 4058690, at *5 (E.D. Pa. Aug. 29, 2008)).

[234] *Pfeiffer*, 989 A.2d at 690–95.

[235] *Id.* at 690.

[236] 2018 WL 6587159, at *16–17.

the company's product did not work nearly as well as the company's disclosures said it did.[237] The Court took judicial notice of the fact that a federal court "*twice*" sustained securities claims, specifically concluding the plaintiffs' allegations were "'sufficient to establish scienter' . . . regarding [the defendants'] knowledge of [the product's] inaccuracy."[238] Against that backdrop, this Court was satisfied that demand was futile.[239]

Here, the Eastern District of Virginia's decision not to dismiss the Exchange Act claims does not "speak to the main ground in this case"—whether the Board failed in bad faith to oversee safety and compliance risks.[240] The Federal Derivative Action challenges the Board's role in alleged misstatements about the Company's safety oversight.[241] In denying the motion to dismiss, the Eastern District of Virginia must have found the allegations satisfied the Exchange Act's scienter requirements, but its order does not contain the sort of detailed scienter findings present in *Pfeiffer* and *Fitbit*; it does not "discuss the allegations on which [the court] relied or the

---

[237] *Id.* at *11–17.

[238] *Id.* at *16.

[239] *Id.* at *17.

[240] *LendingClub*, 2019 WL 5678578, at *16.

[241] *See* Am. Compl. Ex. G.

rationale for [the court's] conclusions."[242] And the scienter inquiries are not the same; rather than addressing the very same wrongdoing, they address disclosure about oversight, and then oversight itself. Liability under Sections 10(b) and 14(a) "would not, in and of itself, have gotten to the heart of whether the directors acted in bad faith" in exercising their oversight duties.[243] Mindful of demand futility's particularity requirement, which exists to preserve director primacy over derivative claims,[244] I do not believe the outcome on the Federal Derivative Action's motion to dismiss supports an inference of bad faith under *Caremark* sufficient to excuse demand.

* * *

Plaintiffs failed to plead a majority of the Board faces a substantial likelihood of liability for their *Caremark* claim. Count I is dismissed. The Board is therefore capable of considering whether to bring Count II against the Officer Defendants

---

[242] *In re TrueCar, Inc. S'holder Deriv. Litig.*, 2020 WL 5816761, at *22 (Del. Ch. Sept. 30, 2020) (rejecting the argument that exposure to liability in a companion federal securities action rendered demand futile on a nearly identical disclosure claim).

[243] *LendingClub*, 2019 WL 5678578, at *15 (further explaining that the case's Section 10(b) and Rule 10b-5 violations "required a showing of scienter," but the Section 11 claim would not, so Section 11 would not "have gotten to the heart of whether the directors acted in bad faith").

[244] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984).

43

based on the same *Caremark* theories,[245] and Count III against all Defendants based on their compensation.  Those counts are likewise dismissed.

### III.    CONCLUSION

Plaintiffs have failed to plead that demand is futile under Court of Chancery Rule 23.1.  Defendants' motion is **GRANTED.**

---

[245] *See* PAB 53–54 ("There is no daylight between the oversight failures of Boeing's directors and officers.").